Eastern District of Kentucky
**FILED**

SEP - 3 2015

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

UNITED STATES OF AMERICA

V.                                    INDICTMENT NO. 0:15-CR-15-DLB

RICHARD E. PAULUS, M.D.

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

**A.    Dr. Paulus and His Medical Practice**

1.    **RICHARD PAULUS** was a licensed interventional cardiologist in the Commonwealth of Kentucky.

2.    From September 11, 1992, to July 22, 2008, **PAULUS** was the sole shareholder, officer and director of Cumberland Cardiology, P.S.C.

3.    On July 22, 2008, Cumberland Cardiology, P.S.C., was purchased by Kentucky Heart & Vascular Physicians, Inc., ("KHVI") a subordinate organization of Ashland Hospital Corporation, d/b/a King's Daughters Medical Center ("KDMC").

4.    On July 24, 2008, KHVI entered into a Physician's Employment Agreement with **PAULUS**.

5. Pursuant to the physician employment agreement, **PAULUS's** billing rights were assigned to KHVI, which, along with KDMC, submitted claims for **PAULUS's** services to Medicare, Medicaid and other public and private insurers.

**B. Medicare and Medicaid**

6. Medicare was a health care benefit program under 18 U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.

7. Medicare Part A (Hospital Insurance) helped cover, among other things, inpatient care in hospitals. Medicare Part A covered medically necessary inpatient hospital care, including medically necessary testing. Beneficiaries were required to meet certain conditions to get these benefits.

8. Medicare Part B (Medical Insurance) helped cover doctors' services, outpatient care, and supplies, when they were ordered by a doctor and were medically necessary. Medicare Part B paid for 80% of the allowed amount of medically necessary physician services, outpatient services and other medical services. The remaining 20% of the Part B charges were paid by the Medicare beneficiary.

9. Medicaid was a health care benefit program under 18 U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals. Medicaid was jointly funded by the states and the federal government. Beneficiaries were required to meet certain conditions

2

to get these benefits.

10. The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs. CMS had the authority to make coverage and medical necessity determinations.

11. At all times relevant, Medicare and Medicaid prohibited payment for items and services that were not "reasonable and necessary" for the diagnosis and treatment of an illness or injury. Medicare claim forms, for example, required the provider who made a claim for services to certify that the services were "medically indicated and necessary for the health of the patient."

12. Federal regulations required that healthcare practitioners provide services economically and only when, and to the extent, medically necessary; were of a quality meeting professionally recognized standards of healthcare; and were supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities. 42 U.S.C. § 1395y(a)(1)(A).

13. **PAULUS** provided and billed for services to Medicare, Medicaid and other publicly and privately insured beneficiaries.

C. **Cardiac Disease, Diagnosis and Treatment**

14. Coronary arterial circulation of blood is fundamental to the functioning of

3

the human heart. The coronary arteries are the blood vessels that run on the surface of the heart and supply the heart muscle with blood, supplying oxygen and nutrients to the heart muscle. The arteries that supply blood to the heart are the left main coronary artery ("LMCA"); the left circumflex artery ("LCX"); the left anterior descending artery ("LAD"); and the right coronary artery ("RCA").

15. Atherosclerosis is the disease process by which plaque builds up in the arteries. This is referred to as Coronary Artery Disease.

16. The coronary arteries supply blood to the heart and can become narrowed or blocked by the accumulation of plaque within the wall of the artery. These plaques can restrict blood flow to the heart muscle by physically clogging the artery or by causing abnormal artery tone and function. This narrowing of the arteries is referred to as a "lesion" or "stenosis."

17. Cardiologists perform a variety of testing to assess, treat and diagnose patients with suspected heart related issues, including coronary artery disease. Preliminary testing includes procedures such as a history and physical, electrocardiogram, echocardiogram, stress testing, nuclear stress testing and blood work. More invasive testing includes cardiac catheterization.

18. Cardiac catheterization is an invasive imaging procedure that is used by a doctor to evaluate, among other things, the presence of coronary artery disease, and to determine the need for further treatment. During a cardiac catheterization, a long, narrow

tube called a catheter is inserted into a blood vessel in the arm or leg. The catheter is guided through the blood vessel to the coronary arteries with the aid of an x-ray machine. Contrast material is injected through the catheter and x-rays are created as the contrast material moves through the heart's chambers, valves and vessels. The images obtained of the coronary arteries by the x-rays and contrast are called coronary angiograms.

19. Cardiologists read the angiogram and review all segments of the arteries and its branches for the amount of narrowing. Cardiologists determine the percent of narrowing by comparing the segment that is narrowed to a nearby segment that is not narrowed.

20. Based on physiologic studies, significant coronary artery disease was defined by the American College of Cardiology as a stenosis greater than or equal to 70% diameter stenosis of at least one major epicardial artery segment. Arteries with less than 50% narrowing are not significantly blocked and do not impair blood flow. Arteries with stenosis between 50 and 70% are borderline and often require additional testing to determine if they significantly impair blood flow. These additional tests include intravascular ultrasound and fractional flow reserve, described below.

21. An additional imaging procedure, called intra-vascular ultrasound ("IVUS"), can be performed together with cardiac catheterization to obtain detailed images of the walls of the blood vessels and a precise measurement of the size of the opening in the artery (or lumen) that is narrowed by plaque. IVUS uses sound waves to enable the physician to

see inside the coronary arteries. During an IVUS procedure, an ultrasound wand is attached to the top of a catheter. This ultrasound catheter is inserted into an artery in the patient's groin area and moved up to the heart. An image is generated and precise measurements can be made. IVUS's primary role is determining the size (diameter/length) of the diseased artery segment, composition of the disease, and to check the adequacy of stent results.

22. Fractional Flow Reserve ("FFR") was another procedure that could have been performed together with a cardiac catheterization. Unlike IVUS, which assesses anatomy, FFR demonstrates the functional performance of the artery and determines the significance of a lesion by its ability to impair blood flow. FFR measures the blood pressure and flow through a specific part of the coronary artery and thereby assists in determining whether or not to perform angioplasty or stenting on intermediate blockages (those between 50 and 70% narrowed).

23. Treatment of stable patients with severe blockages includes medications to reduce the amount of blood the heart needs, cardiac stents to open the blockages, and bypass surgery to divert blood around the blockage.

24. A cardiac stent is a device placed in a coronary artery to treat coronary artery disease as part of a procedure called percutaneous coronary intervention ("PCI"). During this procedure, a catheter with a balloon is threaded through an artery in the groin up to the site of the narrowed coronary artery. The stent is usually placed at the top of the catheter,

over the balloon. Once in place, the balloon is inflated to push the plaque outward against the wall of the artery, widening the artery and restoring the flow of blood through it. Once the stent is open, the balloon is deflated and removed. The stent is then left behind to hold the artery open.

### D.     Reasonable and Necessary Services

25.    Medicare, Medicaid and other health care benefit programs would not pay for a coronary stent that was not "medically necessary." At all relevant times, it was generally accepted within the cardiac community that a coronary stent was not "medically necessary" absent a diagnosis of a least at 70% lesion and symptoms of blockage.

26.    When a patient undergoes a cardiac catheterization or stent, a medical provider must accurately document and maintain a medical record of his findings for treatment of the patient, any intervention and subsequent reimbursement. **PAULUS** documented his findings in the patients' medical records.

27.    Medicare, Medicaid and other health care benefit programs had the authority to conduct reviews of claims for medical necessity and to require the provider of services to produce medical records to support any claim made. A review of medical records enabled Medicare, Medicaid and other health care benefit programs to confirm that the services furnished were reflected on the claim as well as the medical necessity of the services provided. A documented lesion of 70% or greater would be deemed medically necessary for PCI and the claim would be paid.

### E. Dr. Paulus's Procedures

28. At times relevant to this Indictment, **PAULUS** performed more cardiac stent placements than any cardiologist in Kentucky. From 2006 to 2011, **PAULUS** was ranked amongst the top fifteen cardiologists in the United States for the number of inpatient cardiac stent placements for Medicare patients that he performed. From 2006 to 2011, **PAULUS** was ranked first amongst all cardiologists in the United States for total units billed to Medicare for cardiac catheterizations and stent placements.

29. Other cardiologists at KDMC also performed a large number of cardiac stent placements. For example, from 2008 to 2011, KDMC performed more cardiac stent placement procedures for Medicare patients than Mayo Clinic, Johns Hopkins, Cleveland Clinic, the University of Kentucky, the University of Louisville, Kosair Hospital, Baptist Healthcare and Saint Joseph Healthcare.

30. From 2008 to 2011, **PAULUS** performed more cardiac stent placements for Medicare patients than were performed by all the cardiologists in either the University of Kentucky or University of Louisville healthcare systems.

### F. Dr. Paulus's Billings and Compensation

31. At all times relevant to this Indictment, **PAULUS's** compensation was based upon his productivity. In July 2008, **PAULUS** entered into a Physician's Employment Agreement with KHVI. Pursuant to this agreement, **PAULUS** received a $200,000

8

signing bonus. **PAULUS's** total compensation was determined by his professional fees collected, his per capita share of all ancillary and technical fees, minus his direct expenses and his allocable share of all general expenses. His employment agreement also required that **PAULUS** receive a Bi-Weekly salary of $48,197.78.

32. In 2009, **PAULUS's** compensation from KDMC was $2,686,103; in 2010 it was $2,552,839; in 2011 it was $2,598,737; in 2012 it was $1,717,673; and in 2013 it was $692,197.

33. From 2006 to 2012, Medicare paid KDMC in excess of $30,000,000 for inpatient cardiac stent placements performed by **PAULUS**.

34. **PAULUS** retired from KDMC effective July 31, 2013.

G. **The Kentucky Board of Medical Licensure**

35. On November 7, 2012, the Kentucky Board of Medical Licensure ("KBML") received an anonymous grievance alleging fraud, abuse and negligence by **PAULUS.**

36. The KBML reviewed the patient medical file referenced in the anonymous complaint, as well as fourteen additional patient medical files of **PAULUS**.

37. Based upon this review, the KBML concluded that **PAULUS** had engaged in conduct "which departed from or failed to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky" in regard to all fifteen charts reviewed.

38.  The KBML consultant concluded, in part:

The prevailing scenario in these cases seemed to be a patient with few risk factors for heart disease presented with chest pain that had some typical and some atypical features, and the patient would be admitted to hospital and receive limited cardiac medications. Then, rather than receiving a cardiac stress test, would directly undergo coronary angiography. A number of these cases had rather trivial-to-mild coronary artery disease, but by report would be said to have severe disease . . .

[T]here appears to be a consistent pattern of (a) patients not receiving adequate medical therapy nor the therapy being appropriately advanced; (b) angiograms being performed for uncertain or incorrect diagnoses and their results being misinterpreted; (c) stents being inappropriately placed into coronary artery lesions not requiring stents to be placed or being placed in the wrong location; and (d) procedural complications occurring requiring one or more stents to be placed.

39.  On November 7, 2014, **PAULUS** entered into an "AGREED ORDER OF RETIREMENT" with the KBML wherein, in lieu of revocation of his license to practice medicine, **PAULUS** agreed to retire indefinitely from the practice of medicine.

## THE SCHEME AND ARTIFICE TO DEFRAUD

40.  From on or about an exact date unknown but at least July 24, 2008, through on or about July 31, 2013, **PAULUS** did devise and intend to devise a scheme and artifice to defraud and obtain money from federal health care benefit programs by means of false and fraudulent pretenses, representations and promises.

It was part of the scheme to defraud that at various times:

41.  **PAULUS** performed cardiac catheterizations on patients at KDMC and falsely recorded the existence and extent of lesions observed during the procedure in

10

medical records required to be kept by health care benefit programs.

42. **PAULUS** inserted cardiac stents in patients who did not have 70 percent or more blockage in the vessel that he stented and who did not have symptoms of blockage.

43. **PAULUS** placed stents in occluded arteries that already had a functioning coronary bypass, thus providing no medical benefit and increasing the risk of harm to the patient.

44. **PAULUS** performed medically unnecessary cardiac stent procedures on his patients.

45. **PAULUS** caused false and fraudulent claims to be submitted to health care benefit programs.

46. **PAULUS** caused claims for hundreds of medically unnecessary procedures, services and tests to be submitted to health care benefit programs.

47. As a result of these unnecessary procedures, **PAULUS** caused claims for payment to be submitted to Medicare, Medicaid, and other public and private health care benefit programs.

## THE CHARGE

### COUNT 1
### 18 U.S.C. § 1347
### 18 U.S.C. § 2

48. The Grand Jury realleges and incorporates by reference the allegations set forth in paragraphs 1 through 47 of the Indictment.

11

49. From on or about an exact date unknown but at least July 24, 2008, through on or about July 31, 2013, in Boyd County and elsewhere in the Eastern District of Kentucky,

**RICHARD E. PAULUS, M.D.,**

aided and abetted by others known and unknown to the Grand Jury, knowingly and willfully executed, and attempted to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid and other government health care benefit programs and private insurers, and to obtain by means of false and fraudulent pretenses described herein, money and property owned by, and under the custody of Medicare, Medicaid and other government health care benefit programs and private insurers, in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. §§1347 and 2.

## COUNTS 2-27
## 18 U.S.C. § 1035
## 18 U.S.C. § 2

50. On or about the dates listed below, in Boyd County, in the Eastern District of Kentucky,

**RICHARD E. PAULUS, M.D.,**

in a matter involving a health care benefit program as defined in 18 U.S.C. § 24(b), did knowingly and willfully make a materially false, fictitious and fraudulent statement and

12

representation, and make and use any materially false writing and document knowing the same to contain any materially false, fictitious and fraudulent statement and entry, in connection with the delivery of and payment for health care benefits, items and services; that is, **PAULUS** caused an entry in the medical records of the listed patients that reflected a significant degree of stenosis, then well knowing that the record contained a materially false, fictitious and fraudulent statement and entry, in that the degree of stenosis was substantially less than the amount **PAULUS** recorded:

| COUNT | DATE | PATIENT | FALSE BLOCKAGE PERCENTAGE LISTED BY PAULUS | PAYOR |
|---|---|---|---|---|
| 2 | 10/14/10 | G.A. | 75% proximal, 70% RCA | Medicare |
| 3 | 11/18/10 | P.C. | 70%-75% RCA | BCBS |
| 4 | 4/18/11 | J.C. | 60%-70% RCA | Aetna |
| 5 | 4/12/11 | C.C. | 75%-80% posterior ventricular (LAD) | Medicaid |
| 6 | 2/28/11 | S.C. | 60-70% LCX (circumflex) | Anthem Blue Medicare |
| 7 | 11/8/10 | J.D. | 70% RCA | BCBS |
| 8 | 9/29/10 | J.D. | 75% LAD | United Healthcare |
| 9 | 12/20/10 | R.H. | 60-70% obtuse marginal branch | United Healthcare |
| 10 | 4/1/11 | M.H. | 80% LAD | Medicare/BCBS |
| 11 | 4/19/11 | W.J. | 75% LAD | Medicare |
| 12 | 3/14/11 | A.L. | 70% left main | Medicare |
| 13 | 11/4/10 | A.M. | 80% LAD | Medicare |
| 14 | 9/20/10 | E.M. | 70% LAD; 75% RCA; 70% LCX | Medicare |
| 15 | 11/18/10 | B.M. | 70% RCA | Palmetto |
| 16 | 4/13/11 | D.M. | 70% LAD | BCBS |
| 17 | 9/13/10 | A.N. | 70%-80% LAD | Medicare |

| 18 | 10/19/10 | K.P. | 70% RCA | AETNA |
| 19 | 10/14/10 | V.P. | 60%-70% LAD | Medicare |
| 20 | 1/21/11 | R.P. | 75% circumflex | Humana |
| 21 | 9/17/10 | M.R. | 70% LAD | W.V. Medicaid |
| 22 | 12/6/10 | E.R. | 70% RCA | BCBS |
| 23 | 1/7/11 | B.R. | 50%-70% RCA | Medicare |
| 24 | 9/21/10 | C.S. | 70% circumflex | Medical Mutual |
| 25 | 9/21/10 | A.S. | 70%-75% LAD | Humana/Medicare |
| 26 | 11/18/10 | D.T. | 60%-70% LAD | Medical Mutual |
| 27 | 4/27/11 | L.T. | 70%-75% LAD | Medicare/ Ohio welfare |

Each in violation of 18 U.S.C. §§1035(a)(2) and 2.

## FORFEITURE

51.   For the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982, the allegations in Counts 1-27 are incorporated herein by reference. As a result of the foregoing offenses, **RICHARD E. PAULUS, M.D.**, shall forfeit to the United States any property involved in charges set forth herein, or any property traceable to such property and/or any property that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the charges set forth herein, including but not limited to a money judgment in the amount equal to the proceeds **RICHARD E. PAULUS, M.D.**, obtained as a result of such violations.

52.   If any of the proceeds described above, as a result of any act or omission of the Defendant, (a) cannot be located upon the exercise of due diligence; (b) have been transferred or sold to, or deposited with, a third party; (c) have been placed beyond the jurisdiction of the court; (d) have been substantially diminished in value; or (e) have been

commingled with other property which cannot be divided without difficulty; it is the intent of the United States pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of the Defendant up to the value of the property subject to forfeiture.

**A TRUE BILL**

_____
**KERRY B. HARVEY**
**UNITED STATES ATTORNEY**

## **PENALTIES**

| | |
|---|---|
| **COUNT 1:** | Not more than 10 years imprisonment, $250,000 fine, and 3 years supervised release. |
| | If the violation results in serious bodily injury, not more than 20 years imprisonment, $250,000 fine, and 3 years supervised release. |
| **COUNTS 2-27:** | Not more than 5 years imprisonment, $250,000 fine, and 3 years supervised release. |
| **PLUS:** | Mandatory special assessment of $100. |
| **PLUS:** | Forfeiture, as alleged. |
| **PLUS:** | Restitution, if applicable. |

16